1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Easycare, Inc.,                )
                               )      No. CV-08-665-TUC-CKJ-DTF
    Plaintiff,          )
                               )      **REPORT AND RECOMMENDATION**
vs.                            )
                               )
Lander Industries, Inc.,        )
                               )
    Defendant.          )
                               )
_____)

    This matter is before the Court for claim construction, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). The parties filed a Joint Claim Construction and Pre-hearing Statement (Docs. 44-46), opening briefs (Docs. 55, 60, 61) and response briefs (Docs. 69, 70). Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Ferraro for a report and recommendation. A hearing was held on November 9 and 10, 2010. The Magistrate recommends the District Court, after its independent review of the record, construe the terms as set forth below.

## BACKGROUND

    Defendant Lander Industries, Inc. is alleged to have infringed Plaintiff Easycare, Inc.'s U.S. Patent No. 7,461,497 ('497 Patent). The '497 Patent is for a "Slip-on Horse Boot with Replaceable Pastern Gaiter." The patent explains that it advances the art of horse boots, achieving several improvements:

> The advance in the art provided by this invention lies in the performance improvements achieved by using a replaceable gaiter that provides an anchoring function to the back of the boot and an elastic strap that tightens the upper around the front of the hoof in a firm but giving manner. In combination, these novel features make it possible to install the boot with ease,

provide a comfortable wear free of debris, prevent accidental loss of the boot, allow the natural circulatory action associated with pressing on and releasing the hoof, and protect the pastern and hairline from irritation and chafing. If the buckle mechanism is used to secure the front of the boot to the hoof, all these advantages are still present except for the enhancement to the physiological blood-circulation function of the hoof.

'497 Patent 3: 63-67 – 4: 1-9.

In the Complaint, EasyCare alleges that Lander infringed one or more claims of the

'497 Patent. (Doc. 1.) It is apparent from the briefing and hearing that the critical claim at

issue is Claim 10:

10. A horse boot comprising:

a shell that includes a sole, an upper, and a tongue, said shell being limited in size to extend everywhere below a hairline of a hoof of a horse wearing the boot;

a gaiter attached to the upper of the shell, said gaiter including a connecting section enclosing a heel portion of the upper around a back portion of said hoof, and including an open wrapping section with flaps for releasably wrapping around and enclosing a pastern of the horse above the hairline and below a fetlock of the horse, said hairline remaining uncovered by said open wrapping section around a front portion of the hoof; and

a restraining mechanism for strapping the shell of the boot on the hoof of the horse wherein said hairline is in a gap between a front lower edge of said gaiter and an upper edge of said tongue.

'497 Patent 10: 5-20.

In their Joint Claim Construction and Pre-Hearing Statement, the parties agreed on

the construction of two terms:

"Shell": "a portion of a hoof boot that receives the hoof, including a sole, an upper, and a tongue. The shell is sized to remain at all points below the hairline of a horse hoof when installed."

"Interior Surface": "refers to the gripping element being located on the interior surface of the upper."

(Doc. 44 at 1.)

## LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention

to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari*

*Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The construction of patent

claims, which requires determining the meaning and scope of the claims, is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71, 976 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). The terms of a claim are to be given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. There are two situations when a court should ascribe claim terms a meaning other than the ordinary and customary one: if the patentee acts as his own lexicographer and explicitly defines a claim term; or if the claim term is so unclear that its scope cannot be ascertained from the language used. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

When interpreting claims, a court looks first at "the words of the claims themselves, the remainder of the specification, [and] the prosecution history." *Innova*, 381 F.3d at 1116 (citing *Markman*, 52 F.3d at 979-80); *Phillips*, 415 F.3d at 1313 (claim terms are to be looked at in the context of the entire patent); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."). When a claim includes an express limitation regarding a claim term, the term itself should not be interpreted as including that limitation. *See Phillips*, 415 F.3d at 1324 (finding that because the claim included an express limitation as to the function served by "baffles," the limitation was not inherent in the term baffles because then a person skilled in the art would understand the limitation without it being so stated).

A court must consider the specification of which the claim is a part, "it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). "The longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation

1    into a claim from the specification." *Innova*, 381 F.3d at 1117.  In other words, the written

2    description provides context and should be examined for purposes of understanding a claim's

3    meaning, however, the written description and the embodiments therein "will not be used to

4    limit claim language that has broader effect." *Id.*  The purpose of a specification is to allow

5    a person skilled in the art to make the invention, and providing an example is one of the best

6    ways to enable a person to create the invention. *Phillips*, 415 F.3d at 1323.  "Much of the

7    time, upon reading the specification in that context, it will become clear whether the patentee

8    is setting out specific examples of the invention to accomplish those goals, or whether the

9    patentee instead intends for the claims and the embodiments in the specification to be strictly

10   coextensive." *Id.*  If the inventor disavows a particular claim scope in the specification, that

11   is dispositive. *Id.* at 1316.

12        To the extent the Court finds extrinsic evidence helpful in assessing the meaning of

13   the claims it may be considered but it cannot be used to vary or contradict the meaning of the

14   claims. *Markman*, 52 F.3d at 980, 981, 983.  The need for extrinsic evidence arises when the

15   Court is unfamiliar with terminology from the area of art from which the patent arises. *Id.*

16   at 986.  The type of extrinsic evidence that may be helpful "to explain scientific principles,

17   the meaning of technical terms, and terms of art," are "expert and inventor testimony,

18   dictionaries, and learned treatises." *Id.* at 980.  If a court allows the parties to present

19   extrinsic evidence, any such evidence, including expert testimony, that is inconsistent with

20   the intrinsic evidence should not be given any weight. *Vitronics*, 90 F.3d at 1584.  Regarding

21   expert opinions on claim construction, the Court "has complete discretion to adopt the legal

22   expert opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude

23   it." *Markman*, 52 F.3d at 983; *see Vitronics*, 90 F.3d at 1585 ("opinion testimony on claim

24   construction should be treated with the utmost caution, for it is no better than opinion

25   testimony on the meaning of statutory terms.").  The order in which a judge consults various

26   sources is not critical, "what matters is for the court to attach the appropriate weight to be

27   assigned to those sources in light of the statutes and policies that inform patent law."

28   *Phillips*, 415 F.3d at 1324 (citing *Vitronics*, 90 F.3d at 1582).

1   "[O]nly those terms need be construed that are in controversy, and only to the extent

2   necessary to resolve the controversy." *Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.*,

3   200 F.3d 795, 803 (Fed. Cir. 1999).  As a general rule, all claim terms are presumed to have

4   meaning and will not be construed to be superfluous.  *Innova*, 381 F.3d at 1119.  Similarly,

5   when a patent uses different terms the court can infer that the patentee intended those terms

6   to have different meanings; however, such an inference is not dispositive when the context

7   reveals that different words are used to express the same concept.  *Id.* at 1119, 1120.

8   "General descriptive terms will ordinarily be given their full meaning; modifiers will not be

9   added to broad terms standing alone."  *Johnson*, 175 F.3d at 989.  The doctrine of claim

10   differentiation means "the presence of a dependent claim that adds a particular limitation

11   gives rise to a presumption that the limitation in question is not present in the independent

12   claim."  *Phillips*, 415 F.3d at 1315; *Innova*, 381 F.3d at 1123.  "The fact that a patent asserts

13   that an invention achieves several objectives does not require that each of the claims be

14   construed as limited to structures that are capable of achieving all of the objectives."  *Liebel-*

15   *Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004).  Ultimately, "[t]he

16   construction that stays true to the claim language and most naturally aligns with the patent's

17   description of the invention will be, in the end, the correct construction.  *Phillips*, 415 F.3d

18   at 1316.

19                                    **CLAIM CONSTRUCTION**

20       The terms used to describe hoofboots have been borrowed, to some degree, from

21   human footwear (Doc. 56 at 5); therefore, the customary and ordinary understanding of the

22   '497 Patent terms is informed by human shoe terminology.[1]  Additionally, the invention

23

24       [1]    In its Response Brief, Lander contends that during prosecution of the '497 Patent
25   EasyCare disclaimed use of terms from human footwear.  (Doc. 70 at 9, 10.)  The Court
     disagrees.  In the prosecution history cited by Lander, EasyCare merely disputed the
26   Examiner's use of a dictionary definition of gaiter, when assessing anticipation of the
     invention by prior art, to include the term instep, which has no meaning for a horse.  (Doc.
27   29 at 28-29.)  In that same brief, EasyCare relied on dictionary definitions for the ordinary
28   meaning of the term "tongue," as used in relation to human shoes and boots.  (*Id.* at 25-26.)

covered by the '497 Patent is not a highly technical design, therefore, the meaning of many of the claim terms is within the lay knowledge of the Court. *See Phillips*, 415 F.3d at 1314 (claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words.").

In crafting its constructions, the Court adopted the ordinary understanding of terms, to one skilled in the art, whenever not contradicted by the claim language or the intrinsic evidence. The '497 Patent articulates the governing law that the bounds of the patent are established by the claims not the specification:

> Therefore, while the present invention has been shown and described herein in what is believed to be the most practical and preferred embodiments, it is recognized that departure can be made therefrom within the scope of the invention, which is not to be limited to the details disclosed herein but is to be accorded the full scope of the claims so as to embrace any and all equivalent processes and products.

'497 Patent 9: 8-14. The need to strictly adhere to *Phillips*' prohibition on importing limitations becomes evident in application – construction of a term to include limitations from the specification necessarily emphasizes certain embodiments or aspects of the invention to the arbitrary exclusion of others, narrowing the claims without reason.

On November 9, 2010, the Court heard testimony from Plaintiff's expert, Dr. Leslie Barnett Fleming, a veterinarian. Although his testimony was not inconsistent with any other evidence, the Court finds the terms can be construed without resorting to this extrinsic evidence. In accord with this conclusion, at the close of the hearing, EasyCare noted that the only significance of Dr. Fleming's testimony was to confirm that the terms of the '497 Patent do not have unusual meaning but can be given solely their ordinary and customary meaning.

The parties asked the Court to construe seventeen terms. During the course of briefing and argument the parties agreed on a few terms. For the sake of clarity, the Court sets forth each term, including those with an agreed construction.

A.   **Sole**

Both parties agree that the "sole" is an element of the shell. EasyCare proposed as the construction of sole: "A portion of the shell including the portion that contacts the ground."

1   This comports with an ordinary understanding of the term sole for human footwear.  Lander

2   suggests the term be defined in relation to the other portions of the shell: "an element of the

3   shell from which the tongue and the upper extend upward at all points around the sole's

4   base."  Lander argues that its proposed construction should be adopted because it is the

5   ordinary meaning of the term.  However, its proposed construction unnecessarily imputes

6   characteristics of the upper (that it extends upward from the sole) into the definition of the

7   sole.  That goes beyond the ordinary understanding of the term sole.  Further, Lander's

8   argument that the upper be attached "at all points around the sole's base," is based, in part,

9   on the figures in the patent.  However, the figures represent a "preferred" embodiment and

10  one "alternative" embodiment.   '497 Patent 3: 37-38, 50-51.  Drawings of particular

11  embodiments do not limit the coverage provided by the claim terms.  *See Gart v. Logitech,*

12  *Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001).

13      Lander also argues that the upper and tongue must extend up from all points around

14  the sole in order to satisfy the requirement that the shell extend "everywhere below a

15  hairline."  In defining the term shell, the parties agreed it must be "at all points below the

16  hairline," which is distinct from requiring that the shell encircle the entire hoof such that a

17  portion of it is below the hairline at all points of the hairline.  Even if the upper, tongue,

18  and/or shell were required to extend unbroken around the hoof, again, that need not be

19  included in the definition of sole.  Similarly, the term sole need not include the concept that

20  the upper and tongue must enclose the entirety of the sole in order to achieve the goal of

21  preventing debris from entering the shell.  Even if required, that would be part of the

22  definition of the upper or shell (a term up on which the parties agreed without that

23  requirement).

24      The Court adopts EasyCare's construction and construes the term "sole" as "an

25  element of the shell including the portion that contacts the ground."

26  B.   **Upper**

27      EasyCare proposes that the upper be construed as: "a portion of the shell that extends

28  upward from the sole."  During prosecution, EasyCare cited to a dictionary definition that

1  an upper of a shoe is "the upper part of a shoe or a boot, above the sole . . . ." (Doc. 57-1 at

2  5.)  This is in line with the ordinary understanding of an upper in human footwear.

3         Lander does not disagree with EasyCare's construction; however, it proposes that the

4  term should be construed to include additional requirements: "an element of the shell that is

5  a peripheral wall which extends upwards along the back or back portion, and two sides of the

6  sole and may not rise above the hairline of the hoof of the horse."  As an initial matter, it is

7  not necessary to describe the upper as not rising above the hairline because that restriction

8  is in the parties' construction of "shell," of which the upper is included.

9         The remaining portion of Lander's construction is, "a peripheral wall which extends

10  upwards along the back or back portion, and two sides of the sole."  Lander relies on the

11  Background section of the patent, which covers prior art and describes a typical horse boot

12  as one with an upper wrapping around the back and sides of the boot.  '497 Patent 1: 27-29.

13  Nothing in the background or other patent language limits the term upper to this description

14  or indicates that EasyCare is claiming only an upper meeting that definition.  Lander also

15  relies on language from the Background section noting that prior art boots have not resolved

16  the problem of debris entering the boot when the upper separates from the hoof during use.

17  '497 Patent 2: 7-11.  First, preventing an opening between the upper and the hoof requires

18  only that the upper not separate from the hoof where the hoof is covered; it does not

19  necessitate that the upper wrap entirely around the hoof.  Second, preventing debris from

20  entering the boot is only one of the objectives of the EasyCare boot, and claims need not be

21  construed to achieve every objective.  *See Liebel-Flarsheim*, 358 F.3d at 908.

22         In the specification, the upper is described as "an upper extending upward from the

23  sole," '497 Patent 4: 27-28, and as consisting of "a peripheral wall which runs along the edge

24  of the sole on the back and the sides of the shell," '497 Patent 4: 42-43.  Lander argues this

25  qualifies as an explicit definition of upper. (Doc. 55 at 11.)  The Court disagrees.  The cited

26  language refers specifically to Figure 2, which is a preferred embodiment of the boot, not the

27  only way to practice the invention.  '497 Patent 3: 27-33, 37-38, 43-44.

28         As pointed out by Lander, Claims 1 and 10 both reference the heel portion of the

upper. '497 Patent 9: 23, 10: 10-11. While the '497 Patent requires that its upper have a heel portion, that does not necessitate that the term upper as ordinarily understood includes sides and a back. In fact, as EasyCare discussed during the prosecution history of this patent, an upper as defined in prior art is not required to extend along the back and sides of a boot. (Doc. 57-2 at 10; Doc. 57-1 at 5.)

The Court construes the term upper in accord with EasyCare and its common meaning: "a portion of the shell that extends upward from the sole."

C.    **Tongue**

Both parties' proposed constructions include the elements suggested by EasyCare: "a portion of the shell, located at the front of a hoof boot, having a free end." Lander's construction includes several additional elements, that the tongue "is integral with the sole, extends upward from the sole to a free end, and is no higher than the hairline of the hoof of a horse." As with the term upper, the Court does not construe the tongue as not rising above the hairline because the parties have included that restriction in the definition of "shell," of which the tongue is a part.

During prosecution, EasyCare identified the common understanding of the term tongue in relation to a boot to be, a "flap with a free end projecting upward from an opening in the upper . . . protruding upward from the lower, front portion of the upper." (Doc. 57-2 at 11.) EasyCare also relied on two dictionary definitions of tongue, "the flap under the lacing or buckles of a shoe at the throat of the vamp," and "the middle flap in the opening of a shoe or boot." (*Id.*) During the hearing, EasyCare agreed to the above descriptions as the construction for "tongue."

In contrast, Lander contends that the Court cannot use this ordinary meaning of tongue because it is inconsistent with the '497 Patent. Lander argues that, based on the specification, the construction must include that the tongue begins at the sole and is integral with the sole. Lander's proposed construction, that the tongue be "integral with the sole" is itself ambiguous. Therefore, Lander also proposes a construction for the term integral, to mean continuous with the sole. The fact that Lander's proposed construction does not bring

1   clarity to the term is an additional reason the Court rejects it.  The Court agrees a tongue that
2   extends to, and is molded as a continuous piece with, the sole could come within the '497
3   Patent.  However, those elements are not incompatible with EasyCare's proposed customary
4   meaning of the term.

5          The description of the tongue within the specification is somewhat unclear and cannot
6   be read as narrowing the term from the ordinary definition.  This point is highlighted by the
7   parties' contradictory reading of the specification.  For example, the specification states that
8   the tongue's "extent is defined by the slits that separate the top portion of the tongue from
9   the forward edges of the upper." '497 Patent 5: 2-4.  Based on this language, Lander
10  contends there is necessarily a lower portion of the tongue, which extends below the slits to
11  the sole.  In contrast, EasyCare contends the slits define the entire length of the tongue.  The
12  Court believes that at a minimum the slits define the width of the tongue but, reading only
13  this language, the "bottom" portion of the tongue could be at the end of the slits or it could
14  be anywhere between the end of the slits and the sole.  Similarly, review of the drawings of
15  the preferred embodiments leaves open the possibility that the area between the  front edges
16  of the upper and below the slits could be part of the tongue or part of the upper.  The
17  specification indicates that the tongue is preferably integral with the sole and the upper.
18  Lander argues only if its construction is adopted is that possible.  The Court disagrees,
19  reading that language only to suggest that the preferred embodiment involves the entirety of
20  the shell being made as one molded whole, sole, upper and tongue.  '497 Patent 4: 32 ("The
21  boot shell 12 is preferably made of molded plastic").  Reading this preferred embodiment
22  into the claims is contrary to governing law.

23         Because nothing in the specification is inconsistent with the ordinary meaning of the
24  term tongue, as proposed by EasyCare, the Court adopts that construction:  "a flap located
25  at the front portion of the shell with a free end projecting upward from an opening in the
26  shell."

27  **D.**   **Hairline**

28         The parties' proposed definitions of hairline were quite similar.  At the hearing,

1    EasyCare agreed to adopt Lander's proposed construction: "the point where the pastern
2    connects to the hoof and is higher in the front portion than the back portion of the horse's
3    hoof."

4    E.    **Gaiter**
           **A gaiter attached to the upper**

5         The parties agree on this much of the construction for "gaiter": a component of a horse
6    boot that wraps around the pastern. Beyond that, the parties both propose limitations that are
7    set forth separately in the claim and, therefore, need not be included in the term construction.
8    *See Phillips*, 415 F.3d at 1314, 1324 (when claims include express limitations regarding a
9    claim term, the term itself should not be interpreted as including that limitation.) First,
10   EasyCare includes in the definition that a gaiter sits below the fetlock. That requirement is
11   set forth expressly in Claims 1 and 10. '497 Patent 9: 26, 10: 14. Second, Lander includes
12   in its construction that the gaiter extends around the back of the shell and must be attached
13   to the upper. Those are separate limitations in Claim 10, "a gaiter attached to the upper of
14   the shell," and "said gaiter including a connecting section enclosing a heel portion of the
15   upper around a back portion of said hoof." '497 Patent 10: 9-11. Because these
16   requirements are set forth in the claim language, the Court does not include them in its
17   construction of the term gaiter.

18        The remaining element of the construction proposed by Lander is that the gaiter wrap
19   "from the back of the boot." In support of this element of its proposed construction, Lander
20   relies on one sentence in the summary of the invention. (Doc. 55 at 14 n.34 & Doc. 77 at 21
21   n.56 (citing '497 Patent 2: 40-45).) This proposed language goes beyond the ordinary
22   understanding of the term gaiter and does not help define the scope of the claim because it
23   has no clearly understood meaning. Further, Claim 10 includes language describing and
24   limiting the gaiter, without requiring that it wrap "from the back of the boot." Specifically,
25   that the gaiter's connecting section "enclose[ ] a heel portion of the upper around a back
26   portion of said hoof," and the wrapping section wraps and encloses the pastern while leaving
27   the hairline uncovered in the front of the hoof. '497 Patent 10: 10-16. This language, which

28

also requires construction, provides description and limitation for the term "gaiter," and does not necessitate importing the limitation proposed by Lander.  In sum, Lander's proposal inserts a limitation that does not add clarity and is not supported by the intrinsic evidence.

The Court construes the term "gaiter" to mean: "a portion of a hoof boot that wraps around the pastern."

With respect to proposed construction 6, "attached to the upper," EasyCare argues that no construction is needed.  The Court agrees.  Lander does not suggest that "attached" needs to be construed because it uses the term in its briefing interchangeably with the word connected.  The only other substantive words in the phrase, "gaiter" and "upper," are being separately construed, therefore, no construction is needed for the phrase.  Lander's focus is on clarifying that the gaiter must be attached to the upper, as opposed to just the tongue.  EasyCare does not disagree.  That limitation, that the gaiter be attached to the upper, is explicit in the claim and need not be imported into the term "gaiter."

F.    **Connecting section**

Claim 10 provides, "a gaiter attached to the upper of the shell, said gaiter including a connecting section enclosing a heel portion of the upper around a back portion of said hoof . . .."  '497 Patent 10: 9-11.  EasyCare proposes that "connecting section" be defined as "a structure of the gaiter that allows it to be connected to the upper."  The claim language is plain that the connecting section is an element of the gaiter.  EasyCare's construction is in agreement with an ordinary meaning, as understood by a lay person, of how a connecting section would be defined – the connection section would allow the gaiter to connect to the upper.

In contrast, Lander's construction – a durable transition between a mounting section and an open wrapping section – is beyond the scope of the claim language and is contradicted by other claim language.  Claim 1, which is an independent claim, includes a mounting section but not a connecting section while independent Claim 10 includes the connecting section at issue but does not include a mounting section.  Lander contends that EasyCare's construction would define the "connecting section" of Claim 10 and the "mounting section"

of Claim 1 identically, and that is contrary to general rules of claim construction that each word has distinct meaning.

Lander relies on a response EasyCare filed with the Patent Office, in which EasyCare stated that both Claims 1 and 19 (which became Claim 10) "require that the gaiter have a 'section for releasable connection of the gaiter to a heel portion of the upper.'" (Doc. 70-4 at 13.) Lander argues that the connecting section cannot be the component with a releasable connection because that is a separate limitation found in dependent Claim 18, "wherein said connecting section is releasably connected to the heel portion of the upper." '497 Patent 10: 43-45. Lander contends, therefore, that Claim 10 must include a mounting section and the connecting section is between the mounting and the wrapping section.

The Court disagrees with Lander's interpretation. The purpose of EasyCare's response to the Patent Office was to distinguish its horse boot from prior art (Barclay), as requiring that the gaiter be connected to the upper. (Doc. 70-4 at 13.) Although Lander accurately represents EasyCare's filing with the Patent Office, EasyCare appears to have misstated the language of Claim 10 (formerly Claim 19) or it was subsequently changed, because it does not require a releasable connection to the heel of the upper as Claim 1 does. The basis for distinguishing its boot from Barclay was that the gaiter had to be connected to the upper (not that there was a releasable connection to the heel), which EasyCare accurately represented was required by both Claims 1 and 10.

The Court will not read a mounting section, with a releasable connection, into Claim 10 when the patentee chose not to include it. As pointed out by Lander, the mounting section and the connecting section generally would have distinct meanings. The mounting section is necessarily a non-permanent connection ("releasable"), while the connecting section is not required to be releasable. This is highlighted by Claim 18, which specifies that the connecting section is "releasably connected." Because that requirement is contained in a dependent claim, the Court can presume that limitation is not required by the connecting section of Claim 10. Additionally, in the specification, the patentee indicates that when the durability of materials for making the gaiter improve, the invention can be manufactured with

a permanent gaiter.  '497 Patent 6: 44-48.  Thus, the connecting section is not required by the claim language or the specification to be releasable.

The potentially permanent connection allowed for the connecting section need not be contained in the construction.  That distinction would be reflected in the construction of the term mounting section, which would require releasability; however, that term is not being construed in this proceeding.  The Court construes "connecting section" as: "a structure of the gaiter that allows it to be connected to the upper."

G.   **Enclosing a heel portion of the upper around a back portion of said hoof**

Claim 10 states, "said gaiter including a connecting section enclosing a heel portion of the upper around a back portion of said hoof . . ."  The parties' term dispute centers on whether the connecting section must go around the **entire** heel of the upper and back of the hoof.  The Court finds it easiest to evaluate this phrase in sections, construing "back portion of said hoof" before "heel portion of the upper."  Then the Court assesses the phrase as a whole.  With respect to these constructions, the Court finds that neither party has fully and adequately construed the terms.

1.   **Back portion of said hoof**

EasyCare proposes as a construction, "refers to the connecting section also covering a back portion of the hoof," while Lander proposes, "the connecting section encloses the entire back portion of the hoof."

Before reaching the parties' primary disagreement, the Court finds it necessary first to construe "back portion of said hoof," which neither party did in its briefing.  The specifications provide that "[f]or best results of protection and ease of wear of the boot, it is recommended that the back side of the gaiter cover at least the entire back of the hoof (that is, at least 180-degree coverage)."  '497 Patent 6: 16-19.  This suggests the back of the hoof is the 180-degrees of the hoof facing the back of the horse.  This is supported by the fact that Claim 10 also refers to the "front portion of the hoof" (which is construed in Section I below).  If the hoof has a front and a back, each one is reasonably defined as one-half of the hoof.  At the hearing, both parties agreed this is a fair construction of the "back of the hoof,"

which is not a technical anatomical term.

The Court construes "back portion of said hoof" as: "the 180-degrees of the hoof facing to the back of the horse."

### 2. **Heel portion of the upper**

EasyCare proposes that "heel portion of the upper" is the part of the upper that touches or covers the heel of the horse, which is that part of the hoof from about 120 degrees to about 240 degrees around the hoof. Lander construes heel to mean the "back" of the upper, which it defines only as not encompassing the sides of the upper.

As an initial matter, review of the specification suggests the heel of the upper is not a narrow, precisely defined term. Rather, the patent seems to use the "heel," the "rear" and the "back" of the upper, boot or shell as broad somewhat interchangeable terms. '497 Patent 3: 65 (gaiter anchors the back of the boot); 4:29-30 (gaiter fastens to rear portion of boot); 4: 46-48 (shell is small at the back, increases towards the front); 4: 51-52 (rear portion of upper projects to form a lip); 4: 57-60 (rigid band extends around back of the upper); 5: 42-49 (gaiter mounting section attaches to rear lip of upper, conforms to lip and sides of upper, connects to the holes in the upper (which are not on the lip)); 7: 25-26 (gaiter is attached to the heel of the boot).

In light of the fact that a segment of a horse's hoof (the back) is contained within the same phrase, the Court is not compelled by EasyCare's proposition that the heel of the upper should also be defined in relation to the hoof. Although the heel of a shoe or boot generally derives its definition, at least in part, from the location of the human heel, the heel of a particular shoe may or may not directly correlate to the anatomical definition of heel. Additionally, Claims 6 and 12 refer to the heel of the hoof, '497 Patent 9: 40, 10: 27-28, and EasyCare could have used that terminology in Claim 10 if that was what it intended.

Claims 1, 2, 9 and 18 refer to the gaiter being releasably connected to the "heel portion of the upper." '497 Patent 9: 23, 30, 50, 10: 44. That connection to the "heel" is depicted in the drawings of the preferred embodiments as occurring just behind the halfway point dividing the front and the back of the boot. '497 Patent 5: 42-49 & Fig. 2. If the Court

were to adopt Lander's proposed construction, in which the heel of the upper is limited to the rear portion that is depicted as protruding as a lip, distinct from the "sides," the preferred embodiment would be outside the scope of the claim.  The Federal Circuit instructs that this would almost never be the correct construction.  *Vitronics*, 90 F.3d at 1583 (the rare interpretation that would read out a preferred embodiment requires "highly persuasive evidentiary support").  The claims identify the connection point as the heel of the upper, however, the specification refers to that location as both the "rear lip" and the "sides" of the upper, '497 Patent 5: 42-43, 8: 60-63, and the drawings depict it in an area that Lander identifies as the "side."  At a minimum, the "heel" must be broad enough to encompass the connection point of the preferred embodiment, which extends almost to the 180-degree split of the back of the boot from the front.

The claims never use the term "side" of the upper, although  they do refer to the "front portions of said upper," '497 Patent 9: 47-48, 10: 41-42.  The "front portion" as depicted in one of the embodiments is located slightly in front of the halfway point dividing the front and back of the upper.  Thus, both the "heel" of the upper and the "front" of the upper include portions of the upper that might commonly be referred to as the "sides," portions located only a little behind or in front of the halfway point, respectively.

A horse's hoof and, therefore, the hoofboot, are somewhat cylindrical, allowing the Court to discuss it in terms of 360-degree divisions.  As set forth in Claim 10, the enclosure required of the connecting section, necessarily covers, by degrees, the same amount of the upper and the hoof.  For purposes of claim construction then, the heel portion of the upper is roughly commensurate with the back of the hoof.  In other words, the "heel portion of the upper," is any portion of the upper in the rear 180-degrees.  This allows the preferred embodiment to fall within the patent claims.  Additionally, although the context indicates the terms heel and back are similar in meaning, in that they encompass the same portion of a cylinder, the different terms "heel" and "back" are distinguished as one refers to the upper and one refers to the hoof.  *See Innova*, 381 F.3d at 1120 (courts generally infer the patentee intended different terms to have different meanings, unless the context suggests they refer

1   to the same concept).  The Court construes "heel portion of the upper" as "the rear 180-

2   degrees of the upper."

3       3.   **Enclosing a heel portion of the upper around a back portion of said hoof**

4       Lander proposes that the connecting section must enclose the **entire** heel (what it calls

5   the back) of the upper.[2]  The Court disagrees.  The specification uses 180-degree coverage

6   around the back only as a best practice, '497 Patent 6: 15-18, thus, that limitation should not

7   be read into Claim 10.  This is supported by dependent Claim 11, which provides "wherein

8   said connecting section encloses the heel portion of the upper over at least 180 degrees

9   around the back portion of the hoof."  '497 Patent 10: 21-23.  Because Claim 11 requires

10  coverage of at least 180 degrees, Claim 10 necessarily allows for a connecting section that

11  does not go around the entire back 180 degrees.

12      Lander's other arguments are not persuasive.  Lander relies on Figure 1 and the

13  specification indicating that debris is kept out because the only open portion of the invention

14  is in the front half of the hairline.  '497 Patent 6: 10-15.  Again, that is in a paragraph

15  discussing "best practices," and imputes a limitation not included in Claim 10, but included

16  in dependent Claim 11 (as discussed above).  Lander's interpretation violates two rules of

17  construction: the court should not add modifiers to broad terms, *Johnson*, 175 F.3d at 989,

18  and "the presence of a dependent claim that adds a particular limitation gives rise to a

19  presumption that the limitation in question is not present in the independent claim," *Phillips*,

20  415 F.3d at 1315.  Lander also urges, unsuccessfully, that the ordinary usage of the term

21  "around," indicates entire.  While Lander is correct that one purpose of the invention is to

22  prevent debris from entering the boot, and wide coverage by the gaiter best achieves that

23  goal, EasyCare recited multiple other improvements achieved by the invention.  '497 Patent

24  2: 22-27.  "The fact that a patent asserts that an invention achieves several objectives does

25  _____

26      [2]   The parties spent a significant portion of the briefing on whether the connecting
    section can enclose the sides of the upper.  Lander clarified in its response that the language
27  does not preclude enclosing the sides, it was merely distinguishing that it must enclose the
28  back (which it construes as distinct from the sides).

1   not require that each of the claims be construed as limited to structures that are capable of

2   achieving all of the objectives." *Liebel-Flarsheim*, 358 F.3d at 908.

3        Finally, Lander contends that "enclosing" should be construed to mean "wrap around

4   and enclose."   Lander argues that Claim 10 uses "enclosing" in relation to the connecting

5   section, as discussed here, and the flaps, as discussed in Section H below, and that in both

6   cases it means to "wrap around and enclose."  To the contrary, the flaps are stated in the

7   claim as "wrapping around and enclosing."  If "enclosing" means that the structure also

8   wraps, then it would be superfluous to describe the flaps as both wrapping and enclosing.

9   Because the parties do not offer any other construction for the term "enclosing," the Court

10  does not construe it.

11       The Court construes "enclosing a heel portion of the upper around a back portion of

12  said hoof," as: "enclosing part of the 180-degrees of the upper and the hoof facing the back

13  of the horse."

14  H.    **Open wrapping section with flaps**

15       Claim 10 sets forth a "gaiter . . . including an open wrapping section with flaps for

16  releasably wrapping around and enclosing a pastern of the horse." '497 Patent 10: 9, 12-13.

17  EasyCare's proposed construction is a restatement of the claim language with the addition

18  of it being open to, and wrapping around, the front:  "refers to the gaiter having a wrapping

19  section that is open to the front and includes flaps that wrap around the front of the pastern."

20  In contrast, Lander's construction adds numerous restrictions: "the wrapping section is a

21  central portion designed to cover the back portion of the hoof and at least two flaps extending

22  forward that need to be at least 1.5 inches wide and must remain positioned solely above the

23  hairline."

24       Before assessing how the term ultimately should be construed, the Court reviews the

25  various elements in Lander's proposed language.  First, Lander suggests that the wrapping

26  section "cover the back portion of the hoof."   The claim language provides that the

27  connecting section, not the wrapping section, encloses "a heel portion of the upper around

28  a back portion of said hoof."  '497 Patent 10: 10-13.  If the patentee intended that the

1    wrapping section had to perform such a function, it would have included that requirement
2    for both of these components.  In support, Lander cites only the preferred embodiment set
3    forth in the specification, in which the wrapping section is described as covering the back of
4    the hoof.  '497 Patent 5: 16-17.  The Court will not import the limitation from the preferred
5    embodiment into the construction of this term.  *See Innova*, 381 F.3d at 1117.

6          Second, the size requirement in Lander's proposed construction is taken from the
7    same portion of the specification, describing the preferred embodiment, which states, "the
8    flaps need to be at least 1.5 inches wide in order to minimize the pressure exerted on the
9    pastern of the horse."  '497 Patent 5: 24-26.  Based strictly on the language of Claim 10, the
10   size of the open wrapping section is limited solely by the requirement that it be above the
11   hairline and below the fetlock.  Further, Claim 12 is dependent of Claim 10 and provides that
12   the wrapping section is "at least one and a half inches high around the front portion of the
13   hoof."  '497 Patent 10: 26-29.  When a dependent claim includes a particular limitation that
14   "gives rise to the presumption that the limitation in question is not present in the independent
15   claim."  *Phillips*, 415 F.3d at 1315.  Lander's proposed size restriction on the open wrapping
16   section improperly imports a limitation into the claim.

17         Third, Lander's proposed language – "must remain positioned solely above the
18   hairline" – is addressed by other claim limitations and need not be read into the construction
19   of these phrase.  Claim 10 provides that the open wrapping section encloses the pastern
20   "above the hairline," and "said hairline remaining uncovered by said open wrapping section
21   around a front portion of the hoof."  '497 Patent 10: 13-16.  If "open wrapping section with
22   flaps," necessarily meant that it sat above the hairline, the other language of the claim would
23   be superfluous.  *See Phillips*, 415 F.3d at 1324.  Further, the extent to which the hairline
24   should be uncovered is addressed by specific claim language ("said hairline remaining
25   uncovered . . . around a front portion of the hoof") and Lander's proposed language ("remain
26   positioned solely above the hairline") is not an accurate reflection of the explicit limitation.

27         The remainder of Lander's proposed construction is similar to EasyCare's proposed
28   construction.  There is no question from the claim language that the opening wrapping

section is a component of the gaiter.  Additionally, the parties agree that it has two or more flaps for wrapping around the front of the pastern.  Because EasyCare includes that the wrapping section is open to the front and the flaps wrap around the front, Lander's proposed language from the specification that the flaps "extend forward" is duplicative and not necessary.  Lander emphasized at the hearing that the plural nature of the term "flaps" was critical; EasyCare did not dispute that the claim language requires multiple flaps.  The Court construes "open wrapping section with flaps" to mean: "an element of the gaiter that is open to the front, with at least two flaps for wrapping around the front of the pastern."

I.   **Said hairline remaining uncovered by said open wrapping section around a front portion of the hoof**

The only piece of this phrase not separately construed by the Court is "front portion of the hoof."  Lander's proposed construction – the portion of the hoof remaining uncovered by the open wrapping section – provides no meaning as it construes the term solely in relation to the surrounding language.  EasyCare proposes generally the part of the hoof facing the front of the horse.  During the hearing, both parties agreed that the front and back portions of the hoof could be defined as the 180-degrees facing the front of the horse and the rear of the horse, respectively.  Thus, the Court construes "front portion of the hoof" to be "the 180-degrees of the hoof facing to the front of the horse."

J.   **A restraining mechanism for strapping the shell**

Claim 10 provides: "a restraining mechanism for strapping the shell of the boot on a hoof of a horse."  '497 Patent 10: 17-18.  EasyCare's construction of this term is: "any mechanism that secures the shell to the hoof of a horse apart from a gaiter."  Lander sets forth two separate constructions: for restraining mechanism, "limited to a conventional mechanism that is attached to each front side of the upper and provides a tight connection of the boot to the hoof"; and, for strapping the shell, "a tightening means that includes a front folded edge on each side of the upper, not including a strap."

Lander's construction is based primarily on the prosecution history of the '497 Patent.  During the prosecution of the patent, the Examiner required the patentee to elect between

- 20 -

"Species I, as shown in Figs. 1-6," which reflected the embodiment of an elastic strap as the restraining mechanism, and "Species II, as shown in Figs. 7-10," which reflected the embodiment of a conventional restraining mechanism.  (Doc. 44-10 at 21-25.)  EasyCare elected Species II, which it stated corresponded to Figures 3-5 and 7-10.  (*Id.* at 18-20.)  As a result, claims that specified the elastic strap were cancelled as non-elected.  Review of the patent reflects that there are no claims in which the elastic strap embodiment is a specified element of the invention.

Lander argues that based on the prosecution history cited above the restraining mechanism is restricted to a "conventional mechanism," which it juxtaposes against the elastic strap device.  The claims as allowed by the Examiner do not include such a limitation.  Lander provides no factual basis or case law to support its interpretation – that when particular claims are cancelled (as the result of an election during the patent prosecution) that other claims must be construed so as to exclude the species contained in the cancelled claims.  In requiring the election the Examiner did not construe the term "restraining mechanism," thus, the election is of limited significance to this claim construction.  *Cf. Honeywell Intern., Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319 (Fed. Cir. 2006).

Because the Court disagrees with the significance Lander placed on EasyCare's election during the patent prosecution, it must reject Lander's construction which is premised solely on that argument.  Additionally, Lander's construction is premised on the improper importation of limitations from the specifications.  For example, the "conventional mechanism" is clearly set forth in the specification as one **non-preferred** embodiment of the restraining mechanism.  '497 Patent 7: 33-34.  Similarly, the specification provides that the front edges **may** be folded under for purposes of that alternative embodiment.  '497 Patent 5: 4-6, 7: 33-43.  Finally, without foundation, Lander goes well outside ordinary meaning to exclude a strap from the mechanism for "strapping the shell."

EasyCare's construction is commensurate with the ordinary meaning of the term "a restraining mechanism for strapping the shell" and the Court adopts it: "a mechanism that secures the shell to the hoof of a horse apart from a gaiter."

**K.     Wherein said hairline is in a gap between a front lower edge of said gaiter and upper edge of said tongue**

Lander proposes a construction only for the term "gap," and the Court recognizes that the other words in the phrase are either being construed as independent terms (hairline, gaiter, and tongue) or are ordinary words easily understood by a lay person (front, lower, upper, edge).  At the hearing, EasyCare agreed to Lander's proposed construction.[3]  The Court finds Lander's construction to be in accord with the ordinary understanding of the term "gap" and will adopt it: "a break in continuity."

**L.     Stretchable material**

In its Responsive Brief (Doc. 69 at 22-23) and at the hearing, EasyCare agreed with Lander that as to the term "stretchable" it acted as a lexicographer in the patent and the term should be construed accordingly.  In the specification, the patent provides: "[t]he term 'stretchable' is used to refer to elastic materials, as defined above, that can be elongated at least 1.05 times their original size (that is, they can be stretched at least by 5 percent without losing elasticity)."  '497 Patent 4: 17-20.  Lander finished its definition with additional language, "and can include Neoprene."  That language is unnecessary because "stretchable" can include any material, including Neoprene, that meets the definition.  Therefore, the Court construes "stretchable" to mean, " an elastic material that can be elongated at least 1.05 times its original size without losing elasticity."

**M.     Hook-and-loop straps**

Dependent Claim 15 provides, "wherein said flaps of the wrapping section include hook-and-loop straps for securing the gaiter . . . ."  '497 Patent 10: 34-36.

EasyCare proposes, "refers to straps having hook and loop fasteners, for example, Velcro fasteners."  The claim indicates the hook-and-loop will secure the gaiter in place,

---

[3]     In its *Markman* Brief, Lander asks the Court to adopt its proposed construction but reserves the right to challenge the validity of this language.  (Doc. 55 at 28-29.)  In its Response Brief (Doc. 70 at 41) and at the hearing, Lander again urged the invalidity of this claim term.  Because the validity of this term and/or the patent is not currently before the Court, and the parties agree on the construction, the Court construes the term at this time.

1   which is supported by the specification, which states that "hook-and-loop" is a fastening

2   material.  '497 Patent 5: 38-39.  This construction is supported by another reference in the

3   specification, which states that the gaiter could be attached to the shell with a "hook-and-loop

4   strip."  '497 Patent 6: 41.  Hook and loop strips are best known by the brand name Velcro®.

5   *See Transco Prods., Inc. v. Performance Contracting Grp, Inc.*, 813 F. Supp. 613, 617 & n.8

6   (N.D. Ill. 1993); http://www.velcro.com/index.php?page=company (last visited November

7   23, 2010) (Velcro® is a trademark brand for what is generically referred to as hook and loop

8   fasteners).  EasyCare's construction appears to comport with the ordinary and customary

9   meaning of hook-and-loop straps.

10      In contrast, Lander's construction is "two straps adapted for layered engagement."

11   First, Lander does not indicate that "straps" requires construction.  Therefore, it's suggested

12   construction would construe "hook-and-loop," to mean "adapted for layered engagement,"

13   which is not customary or ordinary.  Second, the specification is clear that straps adapted for

14   layered engagement is the preferred embodiment not the only construction for the straps.

15   '497 Patent 5: 30-33.

16      The Court construes "hook-and-loop straps" as: "straps with hook and loop fasteners,

17   for example, Velcro® fasteners."

18   N.   **Gripping element**

19      Claim 16 provides, "further including a gripping element on an interior surface of the

20   upper to increase retention of the hoof within the shell of the boot."  '497 Patent 10: 37-39.

21      EasyCare proposes this term be construed as "refers to a structure that engages with

22   the hoof wall to cause the shell of the boot to resist motion with respect to the hoof."  Lander

23   critiques EasyCare's construction as not providing a relationship between the gripping

24   element and the interior surface of the upper.  In particular, Lander argues that EasyCare's

25   construction does not require that the gripping element be located on an interior surface of

26   the upper.  (Doc. 70 at 44.)  Lander offers as its construction, "an element to grip a hoof

27   mounted internally adjacent to the front edges of the upper."

28      The term "gripping element" should not be construed to include its location because

that is a separate claim limitation – that is must be on the interior of the upper.  '497 Patent 10: 38.  Because the location of the gripping element is a separate limitation, EasyCare's construction follows the ordinary rules of claim construction by not reading that into the term.  *See Phillips*, 415 F.3d at 1314, 1324 (when claims include express limitations regarding a claim term, the term itself should not be interpreted as including that limitation.)  Lander's inclusion of more specific information about the location of the gripping element is an improper importation of limitations from the specification into the claim term.  The specification states that in "a particular embodiment" a gripping element is "mounted internally adjacent to the front edges of the upper."  '497 Patent 8: 7-9.  Neither that limitation nor the many others discussed relative to the particular embodiment (that it include a metal plate, which has teeth and perforations) should be read into the claim.  Once the locational element is removed, Lander's proposal contains no meaningful construction  – it defines a gripping element as an element to grip.

EasyCare's proposal is in accord with the common and ordinary understanding of a lay person and the patent as a whole regarding the gripping element.  This includes the language of the claim, "increase retention of the hoof within the shell," '497 Patent 10: 38-29; the specification regarding a particular embodiment, "grip a hoof and thereby cause the shell of the boot to sit on the hoof more firmly," '497 Patent 8: 16-17; and the summary of the invention, which states that the gripping element "bear[s] against the side of the hoof and further improve[s] retention."  The Court adopts the construction of "gripping element" proposed by EasyCare: "refers to a structure that engages with the hoof wall to cause the shell of the boot to resist motion with respect to the hoof."

O.     **Releasably connected to the heel portion of the upper**

Claim 18 provides, "wherein said connecting section is releasably connected to the heel portion of the upper."  EasyCare proposes that "releasably connected" should be construed as the connecting section of the gaiter being removable from the upper.  Because Lander offers no alternative construction for this portion of the phrase, and it aligns with the ordinary understanding of the term, the Court adopts a similar construction of "releasably

connected" as that proposed by EasyCare.

Within Term G the Court construed the term "heel portion of the upper," thus, it need not be construed here.   The Court construes "releasably connected" as: "provides a removable connection."

## RECOMMENDATION

Based on the foregoing, the Magistrate Judge recommends that the District Court adopt the following claim constructions:

| TERM | COURT'S CONSTRUCTION |
|---|---|
| Sole | an element of the shell including the portion that contacts the ground |
| Upper | a portion of the shell that extends upward from the sole |
| Tongue | a flap located at the front portion of the shell with a free end projecting upward from an opening in the shell |
| Hairline | the point where the pastern connects to the hoof and is higher in the front portion than the back portion of the horse's hoof |
| Gaiter | a portion of a hoof boot that wraps around the pastern |
| Gaiter attached to the upper | No construction necessary |
| Connecting section | a structure of the gaiter that allows it to be connected to the upper |
| enclosing a heel portion of the upper around a back portion of said hoof | enclosing  part of the 180-degrees of the upper and the hoof facing the back of the horse |
| open wrapping section with flaps | an element of the gaiter that is open to the front, with two or more flaps for wrapping around the front of the pastern |
| Said hairline remaining uncovered by said open wrapping section around a front portion of the hoof | No construction necessary |
| front portion of the hoof | the 180-degrees of the hoof facing to the front of the horse |
| a restraining mechanism for strapping the shell | a mechanism that secures the shell to the hoof of a horse apart from a gaiter |

| | |
|---|---|
| Wherein said hairline is in a gap between a front lower edge of said gaiter and upper edge of said tongue | No construction necessary |
| gap | a break in continuity |
| stretchable | an elastic material that can be elongated at least 1.05 times its original size without losing elasticity |
| hook-and-loop straps | straps with hook and loop fasteners, for example, Velcro® fasteners |
| gripping element | refers to a structure that engages with the hoof wall to cause the shell of the boot to resist motion with respect to the hoof |
| releasably connected to the heel portion of the upper | provides a removable connection |

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation.  If objections are not timely filed, they may be deemed waived. If objections are filed, the parties should use the following case number:  **CV 08-665-TUC-CKJ.**

DATED this 1st day of December, 2010.

D. Thomas Ferraro
United States Magistrate Judge

- 26 -